## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| **JAMES BEN BROWNFIELD,** | ] | |
| | ] | |
| **Petitioner,** | ] | |
| | ] | |
| **v.** | ] | **5:19-cv-00356-ACA** |
| | ] | |
| **TERRY RAYBON, Warden** | ] | |
| **of Holman Correctional Facility,** | ] | |
| | ] | |
| **Respondent.** | ] | |

## MEMORANDUM OPINION

Petitioner James Ben Brownfield bludgeoned his sister, grandnephew, and brother-in-law to death with a claw hammer, and was convicted of three counts of capital murder by an Alabama jury. He now moves for habeas relief under 28 U.S.C. § 2254, asserting four claims: (1) trial counsel were ineffective for presenting a false confession defense instead of a voluntary intoxication defense ("Claim One"); (2) trial counsel were ineffective for failing to adequately investigate and present mitigating evidence ("Claim Two"); (3) appellate counsel was ineffective for failing to challenge the trial court's denial of a voluntary intoxication instruction ("Claim Three"); and (4) Alabama's death penalty statute violated the Sixth and Fourteenth Amendments to the United States Constitution ("Claim Four"). (Doc. 1 at 12–103). The court **WILL DISMISS** part of the § 2254 petition as procedurally defaulted and **WILL DENY** the remainder as meritless. The court also **WILL DENY** the motions

for discovery and an evidentiary hearing. Finally, the court **WILL GRANT** a certificate of appealability as to Claims One and Three and **WILL DENY** a certificate of appealability as to Claims Two and Four.

## I.   BACKGROUND

"In a proceeding instituted by an application for writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct." 28 U.S.C. § 2254(e)(1). The court therefore draws its description of the facts from the state courts' findings.

### 1.   The Crimes

In 2001, Mr. Brownfield lived in Scottsboro, Alabama, with his sister, Brenda Whitehead McCutchin, and Ms. McCutchin's three-year-old grandson, Joshua Dewayne Hodges.[1] *Brownfield v. State*, 44 So. 3d 1, 7–8 (Ala. Crim. App. 2007) ("*Brownfield I*"). Late in the evening on December 23 or early in the morning on December 24, 2001, Mr. Brownfield took seven or eight Xanax pills. *Id.*; *Ex parte Brownfield*, 44 So. 3d 43, 50 (Ala. 2009) ("*Brownfield II*"). He had taken crystal methamphetamine "a number of times" in the preceding week. *Brownfield I*, 44 So. 3d at 8.

---

[1] The record reflects different spellings of the name "McCutchin." The court uses the spelling the Alabama Court of Criminal Appeals used.

While Ms. McCutchin and Joshua were asleep in Ms. McCutchin's bed, Mr. Brownfield bludgeoned them to death. *Id.* Ms. McCutchin suffered around twenty blows to her head and "other injuries to her body" and Joshua suffered around sixteen blows to his head and "other injuries to his body." *Id*. Both had "what were characterized as defensive wounds, indicating that they attempted to ward off at least some of the blows from the hammer." *Id*. Using lipstick, Mr. Brownfield wrote messages throughout the house such as "Fuck this God," "Fuck this world," "I'll be dead too," "It's about to pick up," "Don't look for me," "Tammy I love you Always Never 4-get Baby," "Killing is my business," and "My whole life I have been ran over. It's stopping now." *Brownfield I*, 44 So. 3d at 8 (quotation marks omitted); (doc. 30-12 at 190). Before leaving Ms. McCutchin's house, Mr. Brownfield tried to burn it down with kerosene and a cigarette. *Brownfield I*, 44 So. 3d at 7.

Carrying a set of clean clothes and the claw hammer, Mr. Brownfield drove across town to the house where Ms. McCutchin's estranged husband, Latham Durwood McCutchin, lived. *Id.* at 6–8. Mr. Brownfield "pretended a friendly visit" until Mr. McCutchin let him in the house, at which point Mr. Brownfield said he was going to kill him. *Id.* at 7. The two fought and Mr. Brownfield beat Mr. McCutchin with his fists and the hammer, inflicting "at least ten forceful blows to the head," bruising Mr. McCutchin's lower chest, arms, and hands, and fracturing his ribs and a vertebra. *Id.* Mr. Brownfield also used a knife to stab Mr. McCutchin in the heart

3

and cut his throat. *Brownfield I*, 44 So. 3d at 7. Using lipstick, Mr. Brownfield wrote on a wall: "This was necessary Ben. I'm sorry for your family. They deserved it." *Id.* at 8; (doc. 30-12 at 76).

After killing Mr. McCutchin, Mr. Brownfield showered and dressed in the clean clothes he had brought with him. *Brownfield I*, 44 So. 3d at 7. He put his soiled clothes, the claw hammer, and the knife in a garbage bag, which he carried with him to a Christmas party where he told a friend that he was moving to Tennessee because Ms. McCutchin had kicked him out of the house. *Id.* After leaving the party, Mr. Brownfield drove to Stevenson, Alabama, dropped the garbage bag in a dumpster behind a fast food restaurant, and returned to Scottsboro. *Id.* Mr. Brownfield "had contact with friends throughout the day of December 24, 2001" and saw his girlfriend, Tammy Farmer, that evening. *Id.* He told her that he had killed Ms. McCutchin, Mr. McCutchin, and Joshua. *Brownfield I*, 44 So. 3d at 7.

Meanwhile, Mr. McCutchin's son became concerned about his father and drove to the house, where he found Mr. McCutchin's body and called the police. *Id.* The police found evidence implicating Mr. Brownfield and Ms. McCutchin and, on December 25, 2001, went to search Ms. McCutchin's house, where they found her and Joshua. *Id.* Later that day, the police found Ms. McCutchin's car and Mr. Brownfield at Ms. Farmer's apartment, where they arrested him. *Id.* at 7–8. On

December 25 and 26, 2001, Mr. Brownfield made statements confessing to the murders. *Brownfield I*, 44 So. 3d at 8.

### 2. Pre-Trial and Trial Proceedings

Mr. Brownfield was charged with murdering Mr. McCutchin during the course of a burglary, in violation of Alabama Code § 13A-5-40(a)(4), murdering Ms. McCutchin, Mr. McCutchin, and Joshua during one act or pursuant to one scheme or course of conduct, in violation of § 13A-5-40(a)(10), and murdering Joshua, who was under fourteen years of age, in violation of § 13A-5-40(a)(15). (Doc. 30-2 at 6–8). Two attorneys represented him. (*See*, *e.g.*, doc. 30-11 at 168). One of the attorneys focused on the guilt phase of trial and the other focused on the penalty phase and they "pretty much worked independently of one another." (Doc. 30-56 at 37; *see also id.* at 142–43). The attorney in charge of the guilt phase—Richard Fricks—had less than five years' experience and had worked on only two or three non-murder felony trials, a couple of civil automobile accident trials, and no capital murder cases. (*Id.* at 136–39).

Early in the case, the prosecutor told Mr. Fricks that "this is going to be a death penalty case and . . . there [would] not . . . be any negotiations." (Doc. 30-19 at 136–37). Mr. Fricks therefore felt he needed to present a defense that Mr. Brownfield was "not the man and that he didn't commit these murders." (*Id.* at 146–47). Although Mr. Fricks had considered presenting an intoxication defense, he

5

was deeply concerned about Mr. Brownfield's multiple confessions to the crimes and did not believe such a defense would be enough to "challeng[e] the indictment." (Doc. 30-57 at 3, 16–17; doc. 30-56 at 150).

During his investigation, Mr. Fricks learned that Xanax can incite violent behavior (doc. 30-56 at 149), so he hired an expert on its effects (doc. 30-56 at 166–67). When a scheduling conflict prevented that expert from assisting with the case, counsel received permission "to hire Dr. Lee Evans, a psychiatric pharmacologist, as an expert on the effects of Xanax and methamphetamine and to hire Dr. Roger Lacy, a clinical psychiatrist, to evaluate Brownfield to determine his mental state at the time of the crimes and at the time of his confession." *Brownfield v. State*, 266 So. 3d 777, 798 (Ala. Crim. App. 2017) ("*Brownfield III*"). Dr. Lacy opined that "the circumstances were appropriate pharmacologically" for Mr. Brownfield to have falsely confessed based on a false memory. (Doc. 30-6 at 123). At that point, trial counsel "veered off" from the intoxication defense, with the intention of presenting intoxication as part of a potential mitigation case at the penalty phase instead of part of the defense at the guilt phase. (Doc. 30-57 at 3).

> Before trial, Dr. Lacy sent the following bizarre letter to trial counsel:
>
> If the master grants the parched servant water, yet serves it in a cup filled with holes, what then can be said of the smile the master wears?
>
> Dr. Stan Bedsky did not refer you to me for my ability to be cryptic, although I have unique abilities in this realm, with written word and with certain computer encryption. Rather, . . . . Dr. Dixon . . . .

6

recognized my unique skills at spotting patterns (you saw yourself that when I rapidly picked out 2 four leaf clovers in a single patch of grass outside the jail) and gave Stan my name, who then referred you to me. . . .

Does the Court fully realize that, with the death of Ben Brownfield, it means quite possibly, someone other than the defendant may effectively wipe out an entire family? Is that what the Brodsky-Dixon referral chain foresaw?

Already, Expert witnesses are falling out, or not being able to comply with inappropriate timing pressures. Why? You repeatedly put forth motions in a timely manner asking for an expert witness, one who I need to communicate with after he sees Ben. It was only after your motions were twice rejected, after time was leached away, that it was finally granted.

WHY? *WHY? is a really appropriate question to apply to every single step, every single utterance, every single communication, every single piece of crime scene evidence that turns up missing, every single fingerprint NOT done, every single extra unnecessary and burdensome pressure placed upon defense witnesses in this case.*

I asked questions of your client, yet he was clueless as to the answers. I asked questions about why he might be clueless, yet there was no one to answer. I turned to the defense investigator, yet nothing happened. I wrote a letter to you, and you diligently took it to the Court. The Court granted the defendant another investigator. And for a brief moment it seemed as if the servant had been granted a drink of water. But the cup was riddled with holes. Alas, investigator granted, but no time.

Ben Brownfield loses. *WHY?* Maybe the question is wrong Richard. There is a pattern in this case. The pattern suggests the question should be "Why not?"

Look at how things appear. Do we not have eyes? The public will eventually learn about all this, in plain simple language, that is clear and understandable. Someone will live to tell the story. It may not be you or me, but someone will live to tell the story. Why does the Court obviously appear to PRESSURE your expert witnesses to the point of ineffectiveness, drop-out, and surrender to the agenda of the DA? Why is the deck so obviously stacked against Ben Brownfield, or rather, I will now say, that family?

It appears Ben Brownfield was set to die from the beginning. And no one even asked why a "crazed lunatic" would choose lipstick instead of blood smearing? *WHY? WHY? WHY?* The answer is at the beginning—no investigation. The pattern begins. Look closely at the discovery photos and you will see exactly what I mean. *Blood does not run uphill*. You see, whoever "processed" the crime scene seems to have been grossly incompetent. "Processed" has two potential meanings: a) as in setting it up for the PD to discover, or b) the PD discovery process itself. Latham's body shows blood running uphill. He was put into the crime scene. If you carry the theme into the Scottsboro PD corruption scenario, then multiple problematic and frightening scenarios arise. Thank goodness for higher power investigations. God help us if the SPD or someone acting in accordance with them did this or if it was done with any single corrupt officer's awareness, and/or if Brenda McCutchen's motel visits had any bearing on the child's death (a 3-year-old coming into vocabulary, and therefore potentially a threat) then God will use the FBI I am sure. It will be interesting in the worst way if they do turn up child pornography on the internet that reveals the actual enactment of the deaths. Nick, Tammy, and her extra lover are all suspects too.

For your sake Richard, and for mine, I am glad others are watching now. It possibly answers one question as to *why* former lead counsel (face it, you are lead counsel) may have been passive, it's one of those questions better left unasked. If I am afraid, living this far away from the venue, I can only imagine what it must be like up there. But I will admit I am weary of the Court's lack of support. This is NOT a standard case. I am a professional. I do not consider the Scottsboro PD to have treated Ben in a professional manner. If the Court wants professional level work from me, and is serious about this case and the BROAD implications imbued therein, the Court will treat me as a good and loyal servant, and when I ask for a drink of water, I do not ask for it lightly, and I mean I want water, and I mean I am thirsty. In other words, slow this case down—the hearing on suppressing the confession needs to be continued.

One other Scottsboro case stands out in history. This case is apparently making Scottsboro murder history again.

(Doc. 30-7 at 10 (emphases in original); *see also id.* at 15–16).

8

Dr. Lacy, however, was not qualified to testify about false confessions. (Doc. 30-57 at 11). Mr. Fricks attempted to obtain an expert in false confessions, but the state trial court granted permission less than a month before trial was scheduled to begin and the expert's scheduling conflicts precluded his assistance. *Brownfield III*, 266 So. 3d at 798. One day after the trial began, trial counsel received permission to hire Dr. Joe Dixon, another expert in false confessions. *Id.* But Mr. Fricks did not call him to testify at trial because "[h]e would not have been helpful," as "[h]e would not have supported" the false confession defense. (Doc. 30-57 at 12).

The State's case primarily focused on Mr. Brownfield's three confessions to the murders. *Brownfield III*, 266 So. 3d at 799; *see Brownfield I*, 44 So. 3d at 7–8 (noting that Mr. Brownfield confessed to Ms. Farmer and confessed twice to police investigators). In addition to the confessions, the State presented the evidence of the messages written on the walls of the victims' homes (doc. 30-12 at 180, 190–91), a lie Mr. Brownfield told a friend about where Ms. McCutchin was the night she was murdered (doc. 30-14 at 182–83), and evidence that Mr. McCutchin's DNA was found on a shoe belonging to Mr. Brownfield that the police discovered at Ms. Farmer's apartment, *Brownfield III*, 266 So. 3d at 799.

Mr. Fricks attempted to discredit the confessions and the police department's investigation into the murders. *See id.* at 799–800. With respect to the confessions, he elicited testimony that Mr. Brownfield seemed surprised when officers told him

that Joshua was dead (doc. 30-13 at 189–90), that although Mr. Brownfield told officers he committed the murders very early on December 24, a neighbor saw all three victims alive later that day (doc. 30-16 at 26–28, 77-78), that the same neighbor and her daughter later heard screaming from Ms. McCutchin's house and saw a car that did not match the description of the car Mr. Brownfield was driving when he was arrested (*id.* at 29–33, 93–94; *see* doc. 30-12 at 182), and that the story Mr. Brownfield told in his confessions changed over time (doc. 30-14 at 70–71, 83). After the state trial court found Dr. Lacy qualified to testify as an expert about psychiatry, medicine, and false memory (doc. 30-16 at 127, 133–34), Dr. Lacy testified that Mr. Brownfield's drug use before the murders, in combination with his people-pleasing character, made him very suggestible and susceptible to the creation of a false memory of committing the murders (doc. 30-16 at 143–44, 151–52, 156–62, 167–70).

Mr. Fricks also elicited testimony that the police officers relied primarily on Mr. Brownfield's confessions and did little to corroborate Mr. Brownfield's statements about his movements that day (doc. 30-14 at 79–82), that the police did not collect any fingerprints at the crime scenes (doc. 30-12 at 90–91, 116–17; doc. 30-14 at 65), that a forensic scientist could not match Mr. Brownfield's shoe to a shoe print left at Mr. McCutchin's house (doc. 30-14 at 136), that the police did not have a handwriting expert evaluate the writing on the walls (doc. 30-13 at 37–38),

that the police were unable to find the evidence Mr. Brownfield told them he had put in the dumpster (*id.* at 7), that the police did not record their first interview of Mr. Brownfield (*see id.* at 68–70), and that the State's DNA testing was unreliable (doc. 30-17 at 40, 48–59, 77–78).

The jury found Mr. Brownfield guilty of all three offenses. (Doc. 30-3 at 133–35).

At the penalty phase, Dr. Lee Evans, a psychiatric pharmacist, testified that Mr. Brownfield had a history of binging methamphetamine, then using other drugs, such as hydrocodone and Xanax, to end the binge. *Brownfield III*, 266 So. 3d at 805. Dr. Evans explained that methamphetamine and Xanax can cause violent outbursts and opined that the combination "caused a 'drug-induced psychosis' that led to 'homicidal rage,' during which Brownfield was unable to control his actions because of the disinhibition effect of Xanax, and that Brownfield suffered from a 'disassociative reaction' during the murders, as if he was watching someone else commit the crimes." *Id.*; (*see also* doc. 30-18 at 201–03; doc. 30-19 at 4–5).

Dr. Salekin, a clinical and forensic psychologist, testified that Mr. Brownfield "had a difficult childhood, one plagued by isolation and loneliness because he was obese and was teased and ostracized by his peers." *Brownfield III*, 266 So. 3d at 806. Mr. Brownfield had a good relationship with his parents but had to become their caregiver in his early teens because of their poor health and his

11

mother's drug addiction, which caused multiple hospitalizations. *Id.* He began using drugs at age sixteen, when he made friends with people who were using drugs, and his drug use increased when his father died five years later. *Id.* Three years after that, he became rootless when his mother died, and he began using drugs "to the point of becoming an addict." *Id.* According to Dr. Salekin, several months before the murders, Mr. Brownfield became a binge user of methamphetamine, which "has extreme negative side effects, including violence and psychosis." *Brownfield III*, 266 So. 3d at 806.

Dr. Salekin further testified that Mr. Brownfield had a substance dependency disorder and "dysthymic disorder, a form of depression characterized by long term lower level depression, often originating in childhood." *Id.* (quotation marks omitted). She explained that Mr. Brownfield "suffered from chronic sadness, low self-esteem, and suicidal ideations," but that he never spoke to anyone about his problems because he "kept it all in." *Id.* at 806–07 (quotation marks omitted). She also testified that "everyone she spoke to who knew Brownfield described him as a gentle person and indicated that violence was out of character for him." *Id.* at 807. She opined that the murders "were solely the result of his drug use." *Brownfield III*, 266 So. 3d at 807.

Counsel also presented testimony from Mr. Brownfield's half-sister, niece, and friend, who all testified that violence was out of character for Mr. Brownfield.

12

*Id.* In addition, counsel highlighted guilt phase testimony that Mr. Brownfield "was a father figure for Joshua and took care of Joshua." *Id.*

The jury recommended death by a vote of eleven to one. (Doc. 30-3 at 136–38; doc. 30-19 at 82). The state trial court then found three aggravating circumstances: (1) that Mr. Brownfield committed the murder of Mr. McCutchin during the commission of a burglary; (2) that each of the murders was especially heinous, atrocious, or cruel compared to other capital offenses; and (3) that Mr. Brownfield intentionally caused the death of two or more persons by one act or pursuant to one scheme or course of conduct. (Doc. 30-3 at 147, 152–58). The court found one statutory mitigating circumstance (that Mr. Brownfield had no significant history of prior criminal history), but expressly found that Mr. Brownfield was not under the influence of extreme mental or emotional disturbance because, although he had used methamphetamine and Xanax, the court lacked evidence about the quantity of drugs or the times of ingestion; the evidence indicated that people develop tolerance to the effects of drugs; and Mr. Brownfield's actions after the crime indicated that he was not so impaired that he was suffering from an extreme mental or emotional disturbance at the time of the offenses. (*Id.* at 159–61).

With respect to non-statutory mitigating circumstances, the state trial court made the following findings: (1) during Mr. Brownfield's childhood, he "suffered

13

from obesity, was rejected by his peers, and provided the primary care to his ailing parents"; (2) Mr. Brownfield suffered from an untreated substance dependence disorder; (3) Mr. Brownfield experienced periods of sadness and low self-esteem, but he did not suffer from dysthymic disorder because he had a relatively happy childhood and was able to socialize with family and friends and maintain employment in his early adulthood; (4) Mr. Brownfield was saddened but not harmed by the death of his parents when he was an adult; (5) Mr. Brownfield had the capacity to love and care for other human beings and had friends and relatives who cared for him; (6) Mr. Brownfield was a low risk for future violence in prison; (7) Mr. Brownfield cooperated with law enforcement and confessed to the crimes; and (8) Mr. Brownfield had expressed remorse for the deaths of the victims. (*Id.* at 163–64).

The state trial court found that "[a]ll of the mitigating circumstances taken together [were] extremely weak in comparison to the aggravating circumstances that exist in each case." (*Id.* at 164). The trial court therefore imposed a sentence of death in each case. (Doc. 30-3 at 165).

### 3.    Direct Appeal

Of relevance to this § 2254 petition, in his direct appeal Mr. Brownfield argued that Alabama's capital sentencing scheme was unconstitutional because it permitted the trial court to determine whether the aggravating circumstances

outweighed the mitigating circumstances, in violation of *Ring v. Arizona*, 536 U.S. 584 (2002). *Brownfield I*, 44 So. 3d at 35–36. The Court of Criminal Appeals affirmed, explaining that because Alabama's sentencing scheme required the jury to unanimously find at least one aggravating circumstance to make Mr. Brownfield eligible for the death penalty, it did not violate *Ring*. *Id.* at 38. The Court also independently weighed the aggravating and mitigating circumstances and determined "that death was the appropriate punishment." *Id.* at 43. The Alabama Supreme Court granted certiorari and affirmed. *Brownfield II*, 44 So. 3d at 50. The United States Supreme Court denied certiorari. *Brownfield v. Alabama*, 562 U.S. 1003 (2010).

    4.    <u>Postconviction Proceedings</u>

After the conclusion of his direct appeal, Mr. Brownfield filed an Alabama Rule of Criminal Procedure 32 petition asserting various challenges to his convictions and sentence. (Doc. 30-26 at 19). He later amended the petition. (Doc. 30-30 at 4). For ease of reference, this court will call the amended Rule 32 petition "the Rule 32 petition." Of relevance to this § 2254 petition, the Rule 32 petition asserted claims that (1) trial counsel were ineffective for pursuing a false confession defense instead of a voluntary intoxication defense; (2) trial counsel were ineffective for failing to adequately investigate and present mitigating evidence; and (3) appellate counsel was ineffective for failing to challenge the trial court's failure

15

to instruct the jury on voluntary intoxication. (*Id.* at 40–43, 48–84; doc. 30-31 at 27–29, 47–48). The state habeas trial court denied the Rule 32 petition in part (doc. 30-34 at 2–5), and held an evidentiary hearing on several claims, including the ineffective assistance claims at issue in this § 2254 petition (doc. 30-55 at 97; doc. 30-57 at 163; doc. 30-59 at 80; doc. 30-61 at 119).

At the hearing, Mr. Brownfield presented evidence that he asserted trial counsel unreasonably omitted from the trial. With respect to the guilt phase, he called Dr. Jonathan Lipman, a neuropharmacologist, who testified that benzodiazepines like Xanax have a "rare effect that is called paradoxical benzodiazepine rage." (Doc. 30-62 at 3). Because benzodiazepines are also disinhibiting, resistance to the rage is lowered. (*Id.* at 3–4). He also testified that medical literature indicated that people with "preexisting vulnerabilit[ies]" such as depression or borderline personality disorder were more vulnerable to the paradoxical rage reaction. (*Id.* at 16). Mr. Brownfield had preexisting vulnerabilities in the form of his meth use, dependent personality disorder, and overcontrolled hostility. (*Id.* at 17). Those, plus an impending arrest, combined to "render[ ] him exquisitely vulnerable to suffering that so called paradoxical benzodiazepine rage which overwhelmed him, and from which the offenses occurred." (*Id.* at 19; *see also* doc. 30-61 at 161).

With respect to the penalty phase, Mr. Brownfield presented evidence that the house he grew up in was dirty and insect-infested (doc. 30-57 at 83–84, 117–18),

16

that he had attended church as a child (*id.* at 168, 170–71), that he had been a passive and polite child, even when he was ridiculed (doc. 30-58 at 6–7, 8–11, 30–31), that Mr. Brownfield had a loving relationship with his parents and cared for both of them when their health failed them (doc. 30-57 at 67–68, 73–76, 110, 113–14, 174, 197; doc. 30-58 at 40, 43–45), that Mr. Brownfield had never been violent or aggressive (doc. 30-57 at 86, 121, 183, 200; doc. 30-58 at 18–19, 30–31), and that Mr. Brownfield was remorseful about the murders (doc. 30-57 at 90, 184; doc. 30-58 at 20, 58).

Mr. Brownfield also called Dr. Marianne Rosenzweig, a forensic psychologist, who testified about the deficiencies in the mitigation investigation done in Mr. Brownfield's case. (Doc. 30-58 at 69, 71, 77–78, 82, 105–07). Dr. Rosenzweig concluded that Mr. Brownfield had dependent personality disorder and overcontrolled hostility. (*Id.* at 156, 180). Dependent personality disorder "is a pervasive and extensive need to be taken care of that leads to submissive and clinging behavior and fears of separation beginning by early adulthood, and present in a variety of contexts as indicated by" specific criteria. (*Id.* at 157). Overcontrolled hostility is "a psychological construct or theory" under which a person with "very strong inhibitions against expressing any . . . anger or irritation," who "tend[s] to be excessively inhibited, very passive . . . . allow[s] anger to . . . kind of unconsciously build inside" and experiences a triggering event that causes disproportionate anger.

17

(*Id.* at 162–64). She explained that "when someone with overcontrolled hostility kills, . . . they usually overkill." (Doc. 30-58 at 164).

Dr. Rosenzweig testified that the "extraordinary quantity of Xanax" that Mr. Brownfield had reported taking "disinhibited [Mr. Brownfield]'s . . . very stringent controls over his expression of virtually any anger or frustration. And what happened, when he became disinhibited, consistent with overcontrolled hostility, that what was unleashed . . . was—the anger that came out was way out of proportion to the—the triggering event, which may have been some irritation with [Ms. McCutchin] that afternoon." (Doc. 30-60 at 46–47).

Dr. Rosenzweig also testified about Mr. Brownfield's self-reported family history, including his childhood and upbringing, his role as caretaker for his parents, his mother's drug addiction and Munchausen syndrome, his difficult relationships with women, and the development of his drug addiction. (Doc. 30-58 at 182–202; doc. 30-59 at 3–39, 91–100; doc. 30-60 at 5–7, 13–14). Finally, Dr. Rosenzweig conveyed Mr. Brownfield's report that when he was five years old, a teenage babysitter made him put his hands "on her genital area" and that when he was nine years old, an older boy from church sexually abused him for one to two years. (Doc. 30-58 at 198–200).

Dr. Karen Salekin, who had testified during the penalty phase of Mr. Brownfield's trial, testified at the Rule 32 hearing that she had been hired about

18

three weeks before the trial and spent only around eleven hours working on the case. (Doc. 30-61 at 6, 759). She described how she would have conducted the mitigation investigation if she had more than three weeks to prepare. (*Id.* at 84–85).

After the hearing, the state habeas trial court denied the remainder of the Rule 32 petition. (Doc. 30-36 at 25–87). The Alabama Court of Criminal Appeals affirmed. *Brownfield III*, 266 So. 3d at 812. The Alabama Supreme Court denied a petition for writ of certiorari without an opinion. (Doc. 30-65 at 181).

## II.   DISCUSSION

In his § 2254 petition, Mr. Brownfield asserts four claims: (1) trial counsel were ineffective for presenting a false memory/false confession defense instead of a voluntary intoxication defense; (2) trial counsel were ineffective for failing to adequately investigate and present mitigating evidence; (3) appellate counsel was ineffective for failing to challenge the trial court's denial of a voluntary intoxication instruction; and (4) Alabama's death penalty statute at the time of his trial violated the Sixth and Fourteenth Amendments to the United States Constitution. (Doc. 1 at 12–103).

Because Mr. Brownfield filed his § 2254 petition after April 24, 1996, the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") governs this action. *Guzman v. Sec'y, Fla. Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Under AEDPA, where a state court has adjudicated a habeas claim on the merits, a

19

federal court may not grant relief except in highly limited circumstances. *See* 28 U.S.C. § 2254(d).

First, the court may grant habeas relief if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "Clearly established federal law" means "the holdings, as opposed to the dicta, of [the United States Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). "Contrary to" federal law means the state court reached "a conclusion opposite to that reached by [the Supreme] Court on a question of law or . . . the state court decide[d] a case differently than [the] Court . . . on a set of materially indistinguishable facts." *Id.* at 412–13. "Unreasonable application of" federal law means the state court correctly identified "the governing legal principle from [the Supreme] Court's decisions but unreasonably applie[d] that principle to the facts of the prisoner's case." *Id.* at 413. Section 2254(d)(1) sets "a highly deferential standard that is intentionally difficult to meet." *Meders v. Warden, Ga. Diagnostic Prison*, 911 F.3d 1335, 1348 (11th Cir. 2019). A petitioner cannot satisfy the standard merely by showing that the state court reached the wrong result; he must establish that the state court's ruling "was so lacking in justification that there was

20

an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Virginia v. LeBlanc*, 582 U.S. 91, 94 (2017).

Alternatively, a federal court may grant habeas relief if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Again, the petitioner cannot satisfy § 2254(d)(2) by persuading the federal court that the state court's factual finding was wrong. *See Wood v. Allen*, 558 U.S. 290, 301 (2010) ("[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance."). Instead, the petitioner must establish that the evidence is "too powerful to conclude anything but the petitioner's factual claim" or that "the state court's finding was clearly erroneous." *Landers v. Warden, Att'y Gen. of Ala.*, 776 F.3d 1288, 1294 (11th Cir. 2015) (alteration and quotation marks omitted).

Moreover, § 2254 requires the court to presume the correctness of any factual findings by the state court, with the petitioner bearing the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). But even a successful showing under § 2254(e)(1) does not "necessarily mean the state court's decision was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," as required for relief under § 2254(d)(2). *Pye v. Warden, Georgia Diagnostic Prison*, 50 F.4th 1025, 1035 (11th

21

Cir. 2022) (en banc) (quotation marks omitted). A state court's erroneous factual findings can still result in a reasonable decision "so long as the decision, taken as a whole, doesn't constitute an unreasonable determination of the facts and isn't based on any such determination." *Id.* (quotation marks omitted).

Ultimately, if "fairminded jurists could disagree on the correctness of the state court's decision," the state court's decision is not unreasonable. *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quotation marks omitted). But relief is not automatic even if the petitioner can show that the decision was unreasonable. Instead, if a petitioner establishes that a state court's decision is not entitled to deference under § 2254(d), the court reviews the claim *de novo*. *Madison v. Comm'r, Ala. Dep't of Corr.*, 761 F.3d 1240, 1243–44 (11th Cir. 2014).

### 1.  Claim One

Mr. Brownfield asserts trial counsel provided ineffective assistance by presenting a "nonsensical" false confession defense instead of an intoxication defense based on Mr. Brownfield's paradoxical rage reaction to the Xanax he had taken. (Doc. 1 at 12–51). He argues that trial counsel had no strategic reason to pursue the false confession defense and that the choice to do so was unreasonable because the false confession defense lacked any evidentiary support and the intoxication defense explained Mr. Brownfield's actions on the night of the murders. (*Id.* at 30–31, 49–51).

As an initial matter, the State concedes that this claim was exhausted in the state courts, but it challenges seven specific "averments" as unexhausted and procedurally defaulted. (Doc. 20 at 22–23). Mr. Brownfield responds that he raised each of these averments in the state courts and that they are not independent grounds for relief, but instead expansions on the claim he exhausted in state court. (Doc. 25 at 17–19). The court begins with the procedural default question before turning to the merits.

> i.    *Procedural Default*

To exhaust a claim, the petitioner must "give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process" and "fairly present[ing] every issue raised in his federal petition to the [S]tate's highest court, either on direct appeal or on collateral review." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010) (quotation marks and citations omitted).

The State contends that Mr. Brownfield failed to exhaust the following "averments" because he did not present them to the state courts: (1) he was denied effective assistance of counsel under the Fifth Amendment; (2) trial counsel were not qualified to represent him; (3) trial counsel failed to identify an alternate suspect; (4) trial counsel failed to adequately challenge the State's DNA evidence; (5) trial counsel introduced gruesome crime scene photos; (6) trial counsel failed to respond

adequately when a juror notified that trial court that he knew Mr. McCutchin's daughter; and (7) trial counsel failed to adequately coordinate their representation. (Doc. 20 at 22–23, 27).

Mr. Brownfield argued in his Rule 32 petition, on appeal to the Alabama Court of Criminal Appeals, and in his petition for certiorari to the Alabama Supreme Court, that his attorneys were not qualified to represent him, did not adequately coordinate with each other, and failed to adequately challenge the DNA evidence. (Doc. 30-30 at 26–28, 47–48; doc. 30-31 at 53 n.30; doc. 30-34 at 54–57; doc. 30-63 at 63–66; doc. 30-65 at 11, 17, 60–63 & nn.8–9). Accordingly, he exhausted those parts of his claim.

However, Mr. Brownfield did not exhaust the other challenged "averments." He does not dispute that he failed to present any Fifth Amendment ineffective assistance claim. (*See* doc. 25 at 17–19). As for the identification of an alternate suspect, he does not assert that he brought any such argument to the attention of the Rule 32 trial court. (*See id.* at 18). Similarly, although he argues that he brought his allegations about the crime scene photos and the juror to the state habeas trial court's attention, he does not assert that he raised either allegation in his appellate briefs. (*See id.*); *see also Brownfield III*, 266 So. 3d at 797 n.8 (noting that Mr. Brownfield "raised several additional claims of ineffective assistance of trial counsel in his petition" that he did not pursue in his appellate brief, and that the Court of Criminal

24

Appeals therefore "deemed [those claims] abandoned and [would] not consider[ ]" them). Nor are those allegations merely "variations in the factual allegations urged" in support of the ineffective-assistance claim he did exhaust. *See Freeman v. Comm'r, Ala. Dep't of Corr.*, 46 F.4th 1193, 1219 (11th Cir. 2022). Accordingly, Mr. Brownfield failed to "invok[e] one complete round of the State's established appellate review process" with respect to those issues, and they are unexhausted. *Mason*, 605 F.3d at 1119.

Typically, a failure to exhaust results in the dismissal of the claim without prejudice so that the petitioner can return to state court and exhaust the claim properly. *Gore v. Crews*, 720 F.3d 811, 815 (11th Cir. 2013). However, if a petitioner failed to exhaust a claim and "it is clear from state law that any future attempts at exhaustion would be futile," then the petitioner will never be able to satisfy the exhaustion requirement and the claim is procedurally defaulted. *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999). Alabama law mandates denial of successive Rule 32 petitions unless the sentencing court lacked jurisdiction to impose the judgment or the sentence or "the petitioner shows both that good cause exists why the new ground or grounds were not known or could not have been ascertained through reasonable diligence when the first petition was heard, and that failure to entertain the petition will result in a miscarriage of justice." Ala. R. Crim. P. 32.2(b). None of the unexhausted "averments" relate to the sentencing court's jurisdiction or involve

new grounds for relief. (*See* doc. 25 at 18). Accordingly, Mr. Brownfield procedurally defaulted them.

A petitioner may overcome a procedural default only if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *see also Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1353 (11th Cir. 2012). Mr. Brownfield has not asserted that he can satisfy either standard. (*See* doc. 25 at 17–19). As a result, the court **DENIES** the claim of ineffective assistance of counsel as procedurally defaulted to the extent it rests on allegations that his claim arises under the Fifth Amendment, that trial counsel failed to identify an alternate suspect, that trial counsel introduced gruesome crime scene photos, or that trial counsel failed to respond adequately when a juror notified the trial court that he knew Mr. McCutchin's daughter.

### ii.    Merits

To prevail on a claim of ineffective assistance of trial counsel, a petitioner must establish that his counsel's performance was deficient and that the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel's performance is deficient only if it "fell below an objective standard of reasonableness and was outside the wide range of professionally

competent assistance." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 928 (11th Cir. 2001) (quotation marks omitted). A petitioner can establish prejudice by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Reaves v. Sec'y, Fla. Dep't of Corr.*, 872 F.3d 1137, 1148 (11th Cir. 2017) (quotation marks omitted).

The Alabama Court of Criminal Appeals found that trial counsel's decision to present a false confession defense was reasonable because the State's case centered around Mr. Brownfield's confessions and (1) Dr. Lacy had opined that Mr. Brownfield's drug use indicated his confession was false; (2) Dr. Evans corroborated that opinion because he testified that Mr. Brownfield's drug use before the murders made it unlikely he remembered the murders; and (3) evidence undermined the truthfulness of Mr. Brownfield's confession, including "that all three victims were seen alive hours after Brownfield said he had killed them, that Brownfield was seen by multiple people during the exact time he told the police that he was murdering Brenda and Joshua, and that Brownfield's timeline of events was inconsistent with other evidence." *Brownfield III*, 266 So. 3d at 799, 803. By contrast, the intoxication defense rested entirely on Mr. Brownfield's "own self-serving statements that he had taken several Xanax pills just before the murders, statements unsubstantiated by any independent evidence." *Id.* at 804. Moreover, trial

27

counsel chose the false confession over the intoxication defense because he knew the State was unwilling to negotiate about the death penalty and therefore did not want to "conced[e] Brownfield's guilt and rely[ ] solely on intoxication." *Id.*

Because the Alabama Supreme Court did not explain its decision to deny certiorari (doc. 30-65 at 181), this court presumes it adopted the same reasoning used by the Alabama Court of Criminal Appeals, *see Wilson v. Sellers*, 584 U.S. 122, 125 (2018) ("[W]hen the relevant state-court decision on the merits . . . does not come accompanied with those reasons. . . . the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale. It should then presume that the unexplained decision adopted the same reasoning."). Because the Alabama Court of Criminal Appeals' decision rested on a lack of deficient performance by counsel, the court begins with that prong.

Mr. Brownfield contends that the state courts unreasonably rejected his claim that trial counsel performed deficiently by presenting the false confession defense instead of an intoxication defense for a variety of reasons. (Doc. 25 at 21–44). The court will address each separately because that is how Mr. Brownfield has presented them, but the court emphasizes that it has also considered the arguments as a whole.

28

### 1. Counsel's Inexperience

Mr. Brownfield argues that Mr. Frick's decisions warrant little deference because of his lack of inexperience. (*Id.* at 21–24). But the cases he cites do not support his argument.

First, Mr. Brownfield relies on *United States v. Cronic*, 466 U.S. 648 (1984). (Doc. 25 at 23). *Cronic* does not hold that an attorney with little experience is afforded little deference in evaluating his strategic decisions. Instead, that case addressed the different prejudice requirements used to evaluate a claim of ineffective assistance versus a claim of denial of counsel during a critical stage of the proceedings. *Id.* at 659–62. The Court held that an attorney's lack of experience in criminal law or with jury trials does not show a complete denial of counsel. *Id.* at 665. In coming to that conclusion, the Court stated that "[t]he character of a particular lawyer's experience may shed light in an evaluation of his actual performance." *Id.* But that quote is dicta. *See Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1333 (11th Cir. 2016) (defining dicta). And dicta from the Supreme Court cannot constitute "clearly established" law. *See Howes v. Fields,* 565 U.S. 499, 505 (2012) ("[C]learly established law signifies the holdings, as opposed to the dicta, of [the Supreme] Court's decisions.") (quotation marks omitted).

In any event, the Alabama Court of Criminal Appeals expressly considered counsel's lack of experience in rejecting this claim of ineffective assistance. *See*

*Brownfield III*, 266 So. 3d at 813. Mr. Brownfield has not explained how the Court of Criminal Appeals' evaluation of that lack of experience was contrary to or an unreasonable application of clearly established federal law. (*See* doc. 25 at 21–24).

Second, Mr. Brownfield relies on *Chandler v. United States*, 218 F.3d 1305 (11th Cir. 2000) (en banc). (Doc. 25 at 23–24). But circuit court decisions cannot clearly establish federal law. *See Howes,* 565 U.S. at 505. And even if they could, *Chandler* does not hold that an attorney's inexperience lowers the level of deference afforded to his actions; instead, it explains that when an attorney has a lot of experience, the level of deference is even higher than the baseline. *See* 218 F.3d at 1316. But the baseline for what constitutes deficient performance remains the same: "[C]ounsel's conduct is presumed reasonable, [so] for a petitioner to show that the conduct was unreasonable, a petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Id.* at 1315. *Chandler* does not support the proposition for which Mr. Brownfield cites it. Accordingly, the court applies the level of deference mandated by *Strickland*. *See Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."); *Johnson*, 643 F.3d at 928.

### 2.   Reliance on Dr. Lacy was Unreasonable

Mr. Brownfield contends that the Alabama Court of Criminal Appeals unreasonably concluded that counsel reasonably relied on Dr. Lacy's opinion

because Dr. Lacy was not an expert in false confessions, counsel had concerns about Dr. Lacy's mental health, and another expert (Dr. Dixon) advised counsel that he would not support the false confession defense. (Doc. 25 at 24–28). The court will address each part in turn.

First, Mr. Brownfield argues that counsel unreasonably relied on Dr. Lacy's opinion because Dr. Lacy was not an expert in false confessions. (*Id.* at 24–25). But Dr. Lacy was an expert in psychiatry, medical science, and false memory (doc. 30-16 at 127, 133–34), and he recommended that counsel retain an expert in false confessions because he believed Mr. Brownfield's confession could have been based on a false memory (doc. 30-6 at 123). Counsel then repeatedly attempted to obtain authorization from the trial court to hire an expert on false confessions, but the state trial court did not grant permission until less than a month before trial, leaving the expert unable to adequately prepare. *Brownfield III*, 266 So. 3d at 798; (doc. 30-6 at 137). It is clear from the record that Mr. Brownfield did not rely on Dr. Lacy as an expert in false confessions; instead, counsel relied on Dr. Lacy's expert psychiatric and medical opinion to guide his investigation, prompting him to seek an actual expert in false confessions. *See Brownfield III*, 266 So. 3d at 798.

This leads to the second and third arguments, which are intertwined. Mr. Brownfield argues that counsel unreasonably relied on Dr. Lacy's opinion because counsel was concerned about Dr. Lacy's own mental health. (Doc. 25 at 25–

31

26). However, Mr. Brownfield concedes that "it would be imprudent to abandon a defense simply because its proponent is unqualified to support it and perhaps suffering from a mental illness. Instead, the next step would be to consult a qualified expert." (Doc. 25 at 26). He then asserts that counsel failed to do that adequately because Dr. Dixon, who would have been qualified to testify about false memory and false confession, "would not have supported" the defense. (*Id.*; *see* doc. 30-57 at 12).

There are two problems with Mr. Brownfield's position. First, he does not mention the expert retained before Dr. Dixon: Dr. Richard Ofshe, an expert in false confessions. (*See* doc. 25 at 26–28); *see Brownfield III*, 266 So. 3d at 798. Accordingly, counsel did exactly what Mr. Brownfield asserts he should have: he attempted to consult a qualified expert. In fact, he consulted two.

The second problem is that Mr. Brownfield does not adequately address the Alabama Court of Criminal Appeals' finding about why Dr. Dixon did not testify. Mr. Brownfield contends that during the Rule 32 proceeding, counsel testified that Dr. Dixon did not testify at trial because "[h]e would not have been helpful to our defense based upon false confession," as "[h]e would not have supported it." (Doc. 30-57 at 12; *see* doc. 25 at 26–27). Mr. Brownfield contends that this testimony can mean only that Dr. Dixon "advised [counsel] that a false confession theory was unsupported by the facts of the case." (Doc. 25 at 26). But the Alabama Court of

32

Criminal Appeals found it "unclear whether Dr. Dixon was unable to support the defense theory because he had determined that Brownfield's confession was not false or because he had not had sufficient time to form an opinion," given that counsel "did not elaborate at the Rule 32 hearing on why Dr. Dixon would not have been helpful to the [false confession] defense . . . or what Dr. Dixon's opinion was, nor did Brownfield present any other evidence in this regard at the Rule 32 hearing." *Brownfield III*, 266 So. 3d at 798.

Alabama law, like federal law, places on the petitioner the burden of proving the facts supporting a habeas claim. Ala. R. Crim. P. 32.3 ("The petitioner shall have the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief."). Mr. Brownfield's only evidence in support of his assertion that Dr. Dixon believed the false confession defense was meritless is counsel's statement that Dr. Dixon "would not have supported it." (*See* doc. 25 at 26–28). But as the Alabama Court of Criminal Appeals pointed out, counsel did not explain why Dr. Dixon would not have supported the defense, even though he testified at the Rule 32 hearing and Mr. Brownfield had the opportunity to elicit that information. *See Brownfield III*, 266 So. 3d at 798. It was not unreasonable for the Alabama Court of Criminal Appeals to find that Mr. Brownfield failed to carry his burden of establishing the reason for counsel's failure to call Dr. Dixon. *See Tarleton v. Sec'y, Fla. Dep't of Corr.*, 5 F.4th 1278,

33

1287 (11th Cir. 2021) ("If reasonable minds reviewing the record might disagree about the finding in question, on habeas review that does not suffice to supersede the [state] court's determination.") (cleaned up).

Accordingly, Mr. Brownfield has not shown that the Alabama Court of Criminal Appeals unreasonably concluded that counsel reasonably relied on Dr. Lacy's opinion.

### 3.   Lack of Corroboration for the False Confession Defense

The Alabama Court of Criminal Appeals held that independent evidence supported the false confession defense, while the paradoxical rage reaction defense depended entirely on Mr. Brownfield's own self-serving description of his drug use before the murders. *Brownfield III*, 266 So. 3d at 903–04. According to Mr. Brownfield's confession, he killed Ms. McCutchin and Joshua between midnight and 2:00 or 3:00 a.m. on December 24. *Id.* at 800. He left Ms. McCutchin's house between 2:00 and 3:00 a.m., went to Mr. McCutchin's house, killed him, and left at 4:00 a.m. *Id.* He drove to Stevenson, Alabama, where he disposed of evidence of the murders. *Id.* He then drove to Kimball, Tennessee, then back to Scottsboro, where he went to a Wal-Mart and made a purchase. *Id.* at 800.

But evidence from multiple witnesses contradicted this account. *See Brownfield III*, 266 So. 3d at 800. Specifically, a neighbor testified that she saw the three victims alive on her way to work in the morning of December 24 and she saw

34

Ms. McCutchin and Joshua in the afternoon of December 24, even though Mr. Brownfield said he had killed all three by 4:00 that morning. *Id.* The neighbor and her daughter also testified that later that evening, they heard screams from Ms. McCutchin's house and saw a car that was not the car Mr. Brownfield had been driving when he was arrested. *Id.* Three other witnesses testified to seeing Mr. Brownfield between 1:00 and 3:00 a.m. on December 24, during the time period he said he was killing the victims. *Id.* And evidence showed that Mr. Brownfield made the Wal-Mart purchase at 5:04 a.m., even though the drive from Kimball to Scottsboro took at least forty-five minutes each way—making it impossible for Mr. Brownfield to have driven from Scottsboro to Stevenson to Kimball and back to Scottsboro between 4:00 and 5:04 a.m. *Brownfield III*, 266 So. 3d at 800.

Mr. Brownfield does not attempt to rebut the Alabama Court of Criminal Appeals' description of the confession or the evidence contradicting that confession. (*See* doc. 25 at 28–36); *see* 28 U.S.C. § 2254(e)(1) ("[A] determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."). Instead, he argues that the Alabama Court of Criminal Appeals failed to appropriately weigh the strength of the paradoxical rage reaction defense against the weakness of the false confession defense, failed to consider the Alabama Supreme Court's finding that the evidence of guilt was overwhelming, and failed to

consider the weaknesses of the false memory or false confession defense. (Doc. 25 at 29–36, 40–41). The court will consider each argument separately.

First, Mr. Brownfield takes issue with the Alabama Court of Criminal Appeals' determination that the paradoxical rage reaction defense depended entirely on Mr. Brownfield's self-serving statements that he had used Xanax just before the murders. (Doc. 25 at 29); *Brownfield III*, 266 So. 3d at 804. But he does not point to any independent evidence that Mr. Brownfield took Xanax before the murder. (*See* doc. 25 at 29–36, 40–41). He therefore has not rebutted the Alabama Court of Criminal Appeals' finding that he failed to establish that any independent evidence showed he had used Xanax just before the murders.

Instead, Mr. Brownfield challenges the Alabama Court of Criminal Appeals' characterization of Mr. Brownfield's statements about his use of Xanax as "self-serving." (*Id.* at 29); *Brownfield III*, 266 So. 3d at 804. But whether his statements were self-serving is beside the point. The Alabama Court of Criminal Appeals reasonably found that to establish the paradoxical rage reaction defense, Mr. Brownfield needed to introduce evidence that he had taken Xanax shortly before the murders, and the only evidence of Xanax use was his own word. *Brownfield III*, 266 So. 3d at 804. By contrast, counsel had independent evidence that could persuade a jury to doubt the veracity of Mr. Brownfield's confession: testimony from multiple witnesses that the victims were seen alive after Mr. Brownfield said

he killed them, that Mr. Brownfield was seen during the time period he said he was killing them, and that Mr. Brownfield could not have taken the road trip he described in the time frame he described. Assuming Mr. Brownfield's statements about his Xanax use were not self-serving does not change the conclusion that Alabama Court of Criminal Appeals' decision was not "*based on* an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2); *Pye*, 50 F.4th at 1035.

Next, Mr. Brownfield argues that the Alabama Supreme Court found "there was overwhelming evidence that Brownfield did not falsely confess." (Doc. 25 at 30). In the direct criminal appeal, the Alabama Supreme Court explained that "evidence of Brownfield's guilt as to the capital offenses was overwhelming." *Brownfield I*, 44 So. 3d at 50. It then set out evidence of Mr. Brownfield's drug use before the murders, his confessions to the murders, and evidence that blood found on his shoes belonged to Mr. McCutchin. *Id.* Notably, the bulk of the evidence the Alabama Supreme Court relied on was Mr. Brownfield's confessions, not independent evidence corroborating the confessions. *See id.* Accordingly, the Alabama Supreme Court did not find that there was overwhelming evidence Mr. Brownfield did not falsely confess; it found that there was overwhelming evidence of his guilt in large part *because* of his confessions.

This is a fine nuance but an important one in light of Mr. Brownfield's argument. Under Alabama law, the courts review the sufficiency of the evidence supporting a criminal conviction "in the light most favorable to the State." *Ex parte Burton*, 783 So. 2d 887, 891 (Ala. 2000). The Alabama Supreme Court was not required to inquire into the veracity of Mr. Brownfield's confessions: the State presented the confessions and so the Court had to take them as true in evaluating the sufficiency of the evidence. *See id.*

Relatedly, Mr. Brownfield argues that counsel could not reasonably have presented a false confession theory because the evidence of his guilt was overwhelming. (Doc. 25 at 33–36). But as described above, the bulk of the evidence of his guilt came from his confessions, and counsel gathered and presented evidence casting doubt on the veracity of those confessions. And the test for effective assistance under *Strickland* is not "what the best lawyers would have done. Nor is the test even what most good lawyers would have done. [The court asks] only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir. 1992).

Finally, Mr. Brown argues that no evidence supported a false confession defense. (Doc. 25 at 30–33). But he had the opinion of an expert in psychiatry, medical science, and false memory (doc. 30-16 at 127, 133–34), that

38

Mr. Brownfield's memory of murdering the victims was false (doc. 30-6 at 123; doc. 30-16 at 143–44, 151–52, 156–62, 167–70). He also had the opinion of a psychiatric pharmacist that Mr. Brownfield's drug use before the crimes "caused a 'prolonged state of confusion and amnesia' after the murders making it questionable whether Brownfield remembered the murders in the days following or simply used 'bits and pieces' of information from other people to 'put together some sort of story that allowed him to understand what happened.'" *Brownfield III*, 266 So. 3d at 805 (alteration accepted). The court cannot consider the fact that the defense fell apart during trial when evaluating counsel's decisionmaking before trial. *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

In short, the Alabama Court of Criminal Appeals did not unreasonably find that independent evidence supported the false confession defense and that the paradoxical rage reaction defense was supported only by Mr. Brownfield's self-reported drug usage immediately preceding the murders.

### 4. Penalty Phase Counsel Believed the False Confession Defense Would Not Be Successful

Mr. Brownfield contends that guilt phase counsel performed unreasonably because penalty phase counsel indicated that he did not believe the false confession

defense would be successful. (Doc. 25 at 36–37). But he does not explain how disagreement between counsel about a strategic decision makes the decision to choose one defense over another unreasonable. (*See id.*). Nor does Mr. Brownfield point out what alternative defense penalty phase counsel believed would have had a better chance of success. (*See id.*). He offers no argument or allegations about whether penalty phase counsel believed the paradoxical rage reaction was more or less likely to persuade the jury at the guilt phase, as opposed to the penalty phase. (*See id.*). Accordingly, he has not shown that the Alabama Court of Criminal Appeals based its decision on either an unreasonable application of the law or an unreasonable determination of the facts in the light of penalty phase counsel's view of the false confession defense.

### 5.  Execution of the False Confession Defense

Mr. Brownfield contends that counsel failed to effectively present the false confession defense because his opening statement asserted both the false confession defense and an intoxication defense, he failed to call a competent expert to testify in support of it, and he failed to challenge the State's evidence that Mr. Cutchin's blood was found on Mr. Brownfield's shoe. (Doc. 25 at 38–39).

With respect to counsel's opening statement, he told the jury that this was "a case about death by meth." (Doc. 30-11 at 184). Counsel stated that he would present evidence that Mr. Brownfield's family and community, including Ms. Farmer, were

40

involved in a "circle of crime and . . . circle of meth" relating to internet fraud and identity theft, that Mr. Brownfield's "brain was basically fried and that he had very, very little cognitive ability to do anything," that he had amnesia and confusion, that the police investigation was incompetent and the confessions were unreliable, and that the little evidence outside the confession was weak. (*Id.* at 184–88). Contrary to Mr. Brownfield's argument, this argument is not internally inconsistent.

With respect to the lack of an expert in false confession, Mr. Brownfield does not address the fact that, even without an expert in false confession, counsel presented evidence conflicting with the account Mr. Brownfield gave in his confessions and he had an expert in psychiatry and false memory who testified that Mr. Brownfield's memory was false. (*See* doc. 25 at 38; doc. 30-16 at 127–34, 160–72, 198); *Brownfield III*, 266 So. 3d at 803–04. Finally, with respect to the blood evidence, Mr. Brownfield concedes that counsel called a competing DNA expert, who challenged the State's DNA expert's testimony. (*See* doc. 25 at 39; doc. 30-17 at 40, 48–59, 77–78). Mr. Brownfield has not demonstrated that counsel presented the false confession defense so poorly that it amounts to ineffective assistance.

### 6.  Strategic Reason for Choosing the False Confession Defense

Mr. Brownfield contends that counsel's decision to pursue to the false confession defense instead of the paradoxical rage reaction defense was unreasonable. (Doc. 25 at 41–44). He does not address the fact that the Alabama

41

Court of Criminal Appeals found as a fact that it was a strategic decision. (*See id.*); *see Brownfield III*, 266 So. 3d at 803. And this court may not disregard that finding absent clear and convincing evidence or a finding that it was unreasonable in light of the evidence presented to the state court. *See* 28 U.S.C. § 2254(d)(2), (e)(1). As discussed above, Mr. Brownfield has not made that showing. The Alabama Court of Criminal Appeals did not unreasonably find that penalty phase counsel strategically chose to pursue the false confession defense, nor, given the discussion above, did it unreasonably find that the strategic decision was a reasonable one. As a result, the court need not address prejudice. *See Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied in order to show a violation of the Sixth Amendment, the court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.") (citation omitted). Accordingly, the court **WILL DENY** Claim One.

2.    Claim Two

Mr. Brownfield contends that sentencing counsel was ineffective for failing to adequately supervise and prepare a mitigation specialist, interview and prepare mitigating witnesses, obtain and present records about Mr. Brownfield's background, and present additional mitigating evidence at the sentencing hearing. (Doc. 1 at 55–72). He argues that as a result of those failures, counsel did not present evidence of his substance dependence disorder and dysthymic disorder, his social

isolation, the sexual abuse he suffered, his difficult family environment, and his remorse. (*Id.* at 75–97; *see also* doc. 25 at 69–101).

The Alabama Court of Criminal Appeals affirmed the denial of this claim on the ground that Mr. Brownfield could not establish prejudice because "[m]uch of the mitigating evidence presented during the Rule 32 proceeding was cumulative to the mitigating evidence presented during the penalty phase" and "the additional evidence Brownfield presented at the Rule 32 hearing that was not presented at his trial was not so strong and cogent as to create a reasonable probability that the outcome of the trial would have been different had the evidence been presented." *Brownfield III*, 266 So. 3d at 804–11. Because the Alabama Supreme Court did not explain its decision to deny certiorari (doc. 30-65 at 181), this court presumes it adopted the same reasoning used by the Alabama Court of Criminal Appeals. *See Wilson*, 584 U.S. at 125.

First, Mr. Brownfield argues that the Alabama Court of Criminal Appeals' determination about the cumulativeness of the evidence was unreasonable. (Doc. 25 at 77–79, 89–90). "To determine whether the [state court]'s 'largely cumulative' determination was an unreasonable one, [the court must] compare the trial evidence with the other evidence presented during the state postconvictiong proceedings," bearing in mind that courts "generally hold that evidence presented in postconviction proceedings is 'cumulative' or 'largely cumulative' to or

43

'duplicative' of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." *Holsey v. Warden, Ga. Diagnostic Prison*, 694 F.3d 1230, 1260–61 (11th Cir. 2012).

The Alabama Court of Criminal Appeals did not unreasonably determine that "[m]uch of" the newly presented evidence was cumulative of the evidence presented at trial. *See Brownfield III*, 266 So. 3d at 810. At trial, counsel presented evidence that Mr. Brownfield had an isolated and lonely childhood; that in his teens, he was forced to take care of his parents, who were in poor health; that his mother had a serious drug addiction; that he had a significant history of drug use, which worsened after his parents' deaths; that he had taken care of Joshua; that he had a substance dependency disorder and a depression disorder, but he internalized those problems; that he was not a violent man; that his combination of methamphetamine and Xanax caused an uncontrollable violent outburst; and that he was remorseful about the murders. *Id.* at 805–08.

At the Rule 32 hearing, counsel presented additional evidence about Mr. Brownfield's mental state (specifically, dependent personality disorder and overcontrolled hostility); his parents' lives, health, deaths, and the impact those things had on Mr. Brownfield; the role of Xanax in inducing a rage reaction; and his remorse and the love his friends had for him. (Doc. 30-57 at 85, 123, 182–83;

44

doc. 30-58 at 6–7, 9, 13, 20, 30, 35, 58, 156–59, 163–64, 196–98, 201–02; doc. 30-59 at 3–9, 12–13, 16, 20–27, 30–31, 37–38, 84–85, 94–95, 98–103; doc. 30-60 at 1, 3–4, 46–47; doc. 30-62 at 19). Just as in *Holsey*, this additional information "tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury." 694 F.3d at 1260–61. Accordingly, the Alabama Court of Criminal Appeals' decision was not contrary to or an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

The Alabama Court of Criminal Appeals also did not unreasonably decide that "the additional evidence Brownfield presented at the Rule 32 hearing that was not presented at his trial was not so strong and cogent as to create a reasonable probability that the outcome of the trial would have been different had the evidence been presented." *Brownfield III*, 266 So. 3d at 810. The new evidence was hearsay testimony that Mr. Brownfield was sexually abused as a child (once by a babysitter and for one or two years by an older boy) and that Mr. Brownfield was raised in a religious household. (Doc. 30-57 at 170–72, 191–92; doc. 30-58 at 184, 189, 198–200).

Under *Wiggins v. Smith*, 539 U.S. 510, 535 (2003), when faced with a claim that trial counsel was ineffective for failing to present mitigating evidence, the court must decide whether, balanced against the aggravating evidence, the omitted

mitigating evidence would have influenced the sentencer's assessment of the defendant's moral culpability. In *Wiggins*, the aggravating evidence was weak and the only mitigating evidence presented to the jury was that the petitioner had no prior convictions. *Id*. at 537–38. The omitted mitigating evidence was that the petitioner was severely physically and sexually abused from an extremely young age. *Id*. at 516–17. As a result, the United States Supreme Court found that counsel provided ineffective assistance. *Id.* at 537–38. Similar evidence was omitted in other cases in which federal courts have found an unreasonable application of *Wiggins* based on a failure to investigate and present mitigating evidence. *See Williams v. Allen*, 542 F.3d 1326, 1342–43 (11th Cir. 2008) (finding prejudice based on mitigating evidence that as a child, the petitioner was repeatedly severely beaten with deadly weapons, deprived of food and clothing, and did not receive care relating to basic hygiene and medical needs).

By contrast, the mitigating evidence that trial counsel did not present to Mr. Brownfield's sentencing court was weak: it consisted of evidence that Mr. Brownfield told someone he had been sexually abused once by a babysitter and for one or two years by an older boy at his church, and that he was raised in a religious household. (Doc. 30-57 at 170–72, 191–92; doc. 30-58 at 184, 189, 198–200). And the aggravators were strong. The murders were exceptionally brutal: Mr. Brownfield beat his sister and his three-year-old grandnephew to death with a

claw hammer while they attempted to ward off the blows, then drove across town to beat his sister's estranged husband with a claw hammer, stab him in the heart, and cut his throat. *Brownfield I*, 44 So. 3d at 7–8. The state court found that Mr. Brownfield committed one of the murders during a burglary; each of the murders was especially heinous, atrocious, or cruel compared to other capital offenses, and that Mr. Brownfield intentionally caused the death or two or more persons by one act or pursuant to one scheme or course of conduct. (Doc. 30-3 at 147, 152–58). Mr. Brownfield does not dispute that each of those aggravators was appropriate. (*See* doc. 25 at 56–101).

To find the Alabama Court of Criminal Appeals' determination on the prejudice prong unreasonable, this court would have to conclude that no reasonable jurist could have found a lack of prejudice. *See Brooks v. Comm'r, Ala. Dep't of Corr.*, 719 F.3d 1292, 1300 (11th Cir. 2013). But a reasonable jurist could conclude that, weighed against the aggravating evidence, the omitted mitigating evidence would not have changed the sentencing outcome. Accordingly, the Alabama Court of Criminal Appeals' rejection of this *Strickland* claim on the prejudice prong was reasonable. The court therefore **WILL DENY** Claim Two.

47

### 3. Claim Three

Mr. Brownfield asserts that appellate counsel provided ineffective assistance by failing to challenge the trial court's refusal to instruct the jury on involuntary intoxication. (Doc. 1 at 97–100).

During the guilt phase, counsel requested the trial court instruct the jury that "[a] person may become involuntarily intoxicated by introducing into his body substances such as alcohol or other drugs which impair or disturb his mental or physical capacities inadvertently or by accident . . . without knowing the nature or the tendencies of the substance." (Doc. 30-18 at 18; *see* doc. 30-3 at 126). The state trial court refused to give that instruction because the evidence was that Mr. Brownfield "knew what the tendency of the substance was." (Doc. 30-18 at 20, 26).

Appellate counsel did not challenge the trial court's refusal to give the involuntary intoxication instruction. (*See* doc. 30-21 at 2–88). Instead, counsel argued (1) Alabama's capital sentencing scheme was unconstitutional; (2) the state trial court erred in several of its evidentiary rulings; (3) the state trial court erroneously overruled a request to remove certain prospective jurors from the jury pool; (4) the death sentence was imposed because of passion, prejudice, or an arbitrary factor; (5) the Alabama Court of Criminal Appeals should find that the death sentence was inappropriate in this case; and (6) the death sentence was

excessive or disproportionate compared to similar cases. (*Id.* at 11–12). The Alabama Court of Criminal Appeals affirmed. *Brownfield I*, 44 So. 3d at 9–43. The Alabama Supreme Court granted certiorari. *Brownfield II*, 44 So. 3d at 45. The Alabama Supreme Court held that the state trial court erred by admitting certain testimony from a psychologist about statements Mr. Brownfield made during a court-ordered mental examination but nevertheless affirmed because the error was harmless. *Id.* at 47–50.

In his Rule 32 petition, Mr. Brownfield asserted that appellate counsel was ineffective for failing to challenge the denial of the involuntary intoxication instruction. (Doc. 30-31 at 47–48; doc. 30-34 at 46; doc. 30-35 at 28–30). The state habeas trial court found that Mr. Brownfield had not shown that appellate counsel was ineffective. (Doc. 30-36 at 25, 83) ("Brownfield has failed to demonstrate that his appellate counsel was ineffective . . . . [A]ppellate counsel was not ineffective . . . for failing to raise any of the certain claims here pleaded by Brownfield, including his arguments that appellate counsel was ineffective for not appealing the trial counsel's requests for instructions at trial."). The Alabama Court of Criminal Appeals affirmed, explaining that because Mr. Brownfield had not called his appellate counsel to testify at the Rule 32 evidentiary hearing, "the record is silent regarding the reasons counsel did not raise as an issue on appeal whether the trial court erred in denying Brownfield's requested jury instruction on involuntary

intoxication, and we must presume that counsel acted reasonably." *Brownfield III*, 266 So. 3d at 811–12.

Mr. Brownfield contends that the Alabama Court of Criminal Appeals' decision involved an unreasonable application of clearly established federal law because the record establishes that the failure to raise this issue on appeal was ineffective, so appellate counsel's failure to testify at the Rule 32 petition "is irrelevant." (Doc. 25 at 102).

As an initial matter, to the extent the Alabama Court of Criminal Appeals' opinion could be read to set out a *per se* rule that a defendant can establish ineffective assistance only with testimony from his attorney about the attorney's reasoning for making a particular decision, that rule might involve an unreasonable application of clearly established federal law. The *Strickland* decision expressly holds that evaluation of an attorney's representation involves an "objective standard of reasonableness." 466 U.S. at 688. That standard "calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Richter*, 562 U.S. at 110.

But the court is not convinced that the Alabama Court of Criminal Appeals actually set out or followed any such rule. Instead, the more reasonable reading of the Court's opinion is that the evidence Mr. Brownfield presented—the preexisting record—did not suffice to show that appellate counsel provided ineffective

assistance. That decision is not contrary to and does not involve an unreasonable application of clearly established federal law.

"[A] criminal defendant's appellate counsel is not required to raise all nonfrivolous issues on appeal. . . . Experienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most on a few key issues." *Payne v. United States*, 566 F.3d 1276, 1277 (11th Cir. 2009) (cleaned up). As a result, "it is difficult for a defendant to show his counsel was ineffective for failing to raise certain issues on appeal, particularly if counsel did present other strong issues." *Id.*

Here, appellate counsel raised several issues which elicited a lengthy discussion from the Alabama Court of Criminal Appeals. *Brownfield I*, 44 So. 3d at 6–43. The Alabama Supreme Court granted certiorari, ultimately finding that the trial court erred, albeit harmlessly. *Brownfield II*, 44 So. 3d at 44–50. Mr. Brownfield contends that counsel was ineffective because an argument about the denial of his involuntary intoxication instruction "would have been strong, and reversal likely." (Doc. 25 at 102). But he does not address the strength of the arguments appellate counsel chose to pursue or the merits of those arguments relative to the omitted argument. (*See id.* at 102).

Moreover, it is far from clear that Alabama law at the time supported the instruction Mr. Brownfield requested. Although Mr. Brownfield provided a pattern jury instruction with his preferred definition of "involuntary intoxication," pattern jury instructions are not binding law, and neither the Alabama Code nor caselaw provided the same definition used in the proposed instruction.

Alabama Code § 13A-3-2 sets out the defenses of voluntary and involuntary intoxication. It defines voluntary intoxication as "intoxication caused by substances that the actor knowingly introduced into his body, the tendency of which to cause intoxication he knows or ought to know, unless he introduces them under circumstances that would afford a defense to a charge of crime." Ala. Code § 13A-3-2(e)(1). It does not define involuntary intoxication but provides that "[i]nvoluntary intoxication is a defense to prosecution if as a result the actor lacks capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law." *Id.* § 13A-3-2(c).

The commentary to the Code states that "[w]hile cases of involuntary intoxication (force, fraud, artifice) are rare, subsection (c) recognizes that where the actor is not responsible for his intoxicated condition and to the extent that he does not know what he is doing, or cannot control himself, he should be excused." *Id.* § 13A-3-2 cmt. Although the commentary is not a binding statement of the law, *Herndon v. State*, 563 So. 2d 1065, 1068 (Ala. 1990) (holding that the Code's

commentary is "not binding" but may be "of some persuasive value"), the Alabama Court of Criminal Appeals has found that specific commentary section persuasive, relying on it to hold that "involuntary intoxication is intoxication resulting from force, fraud or artifice," *Miller v. State*, 439 So. 2d 800, 802 (Ala. Crim. App. 1983).

In contrast to the statute, legislative commentary, and interpretive caselaw, the pattern jury instruction in effect at the time of Mr. Brownfield's trial offered a definition of "involuntary intoxication" that included voluntarily taking a substance "without knowing the nature or tendencies of the substance." Ala. L. Institute, Pattern Jury Instructions – Criminal, Ala. Code § 13A-3-2(c) and (e) (3d. ed. 1994);[2] (*see* doc. 30-3 at 126). But just as the Code's commentary is not binding, neither are the pattern jury instructions. *See Ex parte Wood*, 715 So. 2d 819, 824 (Ala. 1998) ("While most pattern jury instructions may be properly used in the majority of criminal and civil cases, there may be some instances when using those pattern charges would be misleading or erroneous. In those situations, trial courts should deviate from the pattern instructions and give a jury charge that correctly reflects the law to be applied to the circumstances of the case. . . . [A] trial court must diligently scrutinize the jury charges it gives—even pattern charges—on a case-by-case basis

---

[2] In 2014, the pattern jury instruction was amended to read: "*Involuntary intoxication* is when the defendant became intoxicated because of a substance given to him/her against his/her will or without his/her knowledge." Pattern Jury Instructions – Criminal, Intoxication Defense, https://judicial.alabama.gov/Library/JuryInstructions (adopted Dec. 22, 2014) (last visited March 16, 2026).

53

to ensure that they properly instruct the jury in accordance with applicable statutes and caselaw."); *Ex parte Harrell*, 470 So. 2d 1309, 1314 (Ala. 1985) (noting that other pattern instructions "are to be considered as patterns only and should be altered or changed as circumstances indicate[ ].").

This court does not purport to define "involuntary intoxication" under Alabama law or to make any holding about the accuracy of the pattern instruction in existence at the time of Mr. Brownfield's trial. The lack of statutory definition, the conflict between the commentary and the pattern instructions, and the only Alabama case to have addressed the definition of the term show that the definition was not clear-cut. Given that lack of clarity and the existence of other strong arguments that appellate counsel did raise, it was reasonable for the Alabama Court of Criminal Appeals to conclude that Mr. Brownfield had not overcome the presumption that counsel performed reasonably when he selected the arguments he believed strongest on appeal. *See Strickland*, 466 U.S. at 690 (holding that in evaluating a claim of ineffective assistance, "the court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment"); *see also Payne*, 566 F.3d at 1277. The court therefore **WILL DENY** Claim Three.

### 4. Claim Four

Mr. Brownfield asserts that the death penalty scheme in effect in Alabama at the time of his sentencing was unconstitutional, under *Hurst v. Florida*, 577 U.S. 616 (2016), *Ring*, and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), because (1) the sentencing judge made the findings necessary to impose the death penalty and (2) the jury's verdict shows that the jury did not unanimously agree that the aggravating circumstances outweighed the mitigating circumstances. (Doc. 1 at 101–03; doc. 25 at 103–07).

The jury found Mr. Brownfield guilty of murdering Mr. McCutchin during a burglary, in violation of Alabama Code § 13A-5-40(a)(4), murdering Ms. McCutchin, Mr. McCutchin, and Joshua during one act or pursuant to one scheme or course of conduct, in violation of Alabama Code § 13A-5-40(a)(10), and murdering Joshua, who was under fourteen years of age, in violation of Alabama Code § 13A-5-40(a)(15). (Doc. 30-3 at 133–35; *see* doc. 30-2 at 6–8). The jury recommended a sentence of death by a vote of eleven to one. (Doc. 30-3 at 136–38). After independently weighing the aggravating and mitigating circumstances, the state trial court imposed the death sentence. (Doc. 30-19 at 107; *see also* doc. 30-3 at 147–65).

On direct appeal, Mr. Brownfield argued that his death sentence violated the Sixth Amendment because (1) under *Ring*, the jury needed to determine whether

the aggravating circumstances outweighed the mitigating circumstances; and (2) the jury's advisory verdict was not unanimous. (Doc. 30-21 at 22–25). In 2007, the Alabama Court of Criminal Appeals rejected those arguments, holding that (1) *Ring* required only that a jury unanimously find the existence of a fact that can make a crime death-eligible, allowing the court to weigh the circumstances in determining whether to impose the death sentence; and (2) the jury's recommendation of death did not need to be unanimous because it was advisory only. *Brownfield I*, 44 So. 3d at 35–40). The Alabama Supreme Court granted certiorari. (Doc. 30-23 at 211). In 2009, it affirmed without expressly addressing the *Ring* arguments. *Brownfield II*, 44 So. 3d at 44–51. Because the Alabama Supreme Court did not explain its decision about that issue, this court presumes it adopted the same reasoning used by the Alabama Court of Criminal Appeals. *See Wilson*, 584 U.S. at 125.

As an initial matter, Mr. Brownfield relies heavily on the U.S. Supreme Court's decision in *Hurst*, which that Court issued in 2016, years after the Alabama courts rejected Mr. Brownfield's *Ring* arguments. (Doc. 1 at 101; doc. 25 at 103–07). Both the Eleventh Circuit and the U.S. Supreme Court have held that *Hurst* is not retroactively applicable to cases on collateral review. *McKinney v. Arizona*, 589 U.S. 139, 145 (2020); *Knight v. Fla. Dep't of Corr.*, 936 F.3d 1322, 1335–37 (11th Cir. 2019). Accordingly, the court cannot consider this claim in the context of the

56

*Hurst* decision but instead must limit its review to whether the state court's rejection was "contrary to, or involved an unreasonable application of, clearly established Federal law" in existence as of 2009. *See* 28 U.S.C. § 2254(d)(1); *see Wiggins*, 539 U.S. at 520 (holding that § 2254 requires courts to limit their "analysis to the law as it was 'clearly established' by [the Supreme Court's] precedents at the time of the state court's decision").

In 2000, the United States Supreme Court held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490. Two years later, the Supreme Court held that "[c]apital defendants . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." *Ring*, 536 U.S. at 589. In that case, a jury found the defendant guilty of felony murder, an offense for which the maximum penalty was life imprisonment. *Id.* at 592. But Arizona's capital sentencing scheme permitted the trial judge to impose a death sentence after conducting a separate sentencing hearing and finding the existence of aggravating and mitigating circumstances. *Id.* The trial judge sentenced the defendant to death based on evidence presented only to the court. *Id.* at 593–95. Relying on *Apprendi*, the United States Supreme Court held that Arizona's capital sentencing scheme was unconstitutional because it allowed the sentencing judge to

57

find the facts necessary to impose the death penalty, which otherwise would not have been available. *Id.* at 609.

Here, the Alabama Court of Criminal Appeals rejected Mr. Brownfield's *Ring* claim because the offenses that a jury found Mr. Brownfield committed included as necessary elements two aggravating circumstances, "making Brownfield eligible for the death penalty." *Brownfield I*, 44 So. 3d at 38 ("[I]n returning guilty verdicts as to the charged capital offense of burglary-murder and the capital offense of the murder of two or more people during one act or pursuant to one scheme or course of conduct, the jury of necessity unanimously found that two statutory aggravating circumstances had been proven beyond a reasonable doubt."). Its decision was neither contrary to nor an unreasonable application of *Ring* or *Apprendi*.

The *Apprendi* Court highlighted that the rule it announced did not "render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death." 530 U.S. at 496. Indeed, the Supreme Court explained that "once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." *Id.* at 497 (quotation marks omitted). And *Ring* involved a capital

sentencing scheme under which the jury never made the findings necessary to elevate the punishment from imprisonment to death. 536 U.S. at 597, 609.

Because the Alabama courts' rejection of this claim was not contrary to and did not involve an unreasonable application of clearly established federal law, the court **WILL DENY** Claim Four.

## III.    DISCOVERY AND EVIDENTIARY HEARING

Mr. Brownfield requests permission to seek additional discovery, authority to obtain subpoenas in support thereof and an evidentiary hearing based on the discovered information and/or on the Section 2254 pleadings. (*See* Doc. 1 at 103–07). "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracey v. Gramley*, 520 U.S. 899, 904 (1997). Instead, the court may authorize discovery if the party requesting discovery establishes good cause. Rules Governing Section 2254 Cases, R. 6(a)–(b); *Issacs v. Head*, 300 F.3d 1232, 1248 (11th Cir. 2002). And a court is not required to hold an evidentiary hearing but may do so in its discretion if "such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007), Because it is clear from the record that Mr. Brownfield cannot prevail on his Section 2254 petition, neither discovery nor an evidentiary hearing is necessary. The court

therefore **WILL DENY** Mr. Brownfield's requests for both discovery and an evidentiary hearing.

## IV.   CERTIFICATE OF APPEALABILITY

When the court enters a final order adverse to the petitioner, the court must also either grant or deny a certificate of appealability. Rules Governing Section 2254 Cases, R. 11(a). This court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further," *Miller-El v. Cockrell*, 537 U.S. at 336 (quotation marks omitted). Mr. Brownfield has not made that showing with respect to Claims Two and Four. However, the court **WILL GRANT** a certificate of appealability as to Claims One and Three.

## V.   CONCLUSION

The court **WILL DENY** Mr. Brownfield's § 2254 petition. The court **WILL DENY** Mr. Brownfield's motions for discovery and an evidentiary hearing. The court **WILL DENY** a certificate of appealability as to Claims Two and Four, but **WILL GRANT** a certificate of appealability as to Claims One and Three, as follows:

60

(1)     Whether trial counsel provided ineffective assistance by presenting a false confession defense instead of an intoxication defense based on Mr. Brownfield's paradoxical rage reaction to Xanax he took before the murders.

(2)     Whether appellate counsel was ineffective for failing to challenge the state trial court's denial of an involuntary intoxication instruction.

The court will enter a separate final order consistent with this opinion.

**DONE** and **ORDERED** this March 16, 2026.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE